No. 100,074

STATE OF KANSAS, *Appellee*, v. ALBERT EUGENE RICHMOND,
*Appellant*.
(212 P.3d 165)

Opinion filed July 24, 2009.

*Christina Waugh,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant, and *Albert E. Richmond,* appellant, was on a supplemental brief pro se.

*Jared S. Maag*, deputy solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Albert Richmond was convicted of first-degree premeditated murder for shooting Tyrone Owens and sentenced to prison without the possibility of parole for 50 years (hard 50). Our jurisdiction of his direct appeal is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the trial court err in admitting into evidence a statement made by Richmond more than 2 years before the shooting? No.
2. Did the trial court deny Richmond his right to present his defense when ruling that the State could present evidence of his 1995 convictions if his testimony provided an innocent explanation for his presence at the shooting scene? No.
3. Did the trial court err in admitting into evidence specific instances of Richmond's drug dealing as evidence of his motive, knowledge of the local drug culture, and awareness that drug dealers may carry money on their persons? No.
4. Did the prosecutor commit reversible misconduct? No.
5. Did cumulative error deny Richmond his fundamental right to a fair trial? No.
6. Were Richmond's Sixth and Fourteenth Amendment rights violated when the trial court imposed a hard 50 sentence without submitting the aggravating factors to a jury for proof beyond a reasonable doubt? No.

Accordingly, we affirm.

## FACTS

On October 21, 2006, defendant Albert Richmond, Rayland Brown, Ramone Hester, and Malcolm Jackson traveled to a convenience store in Pittsburg so Hester could buy marijuana from Tyrone Owens. Jackson drove the car, with Richmond in the front passenger seat and Hester and Brown in the back.

Upon arrival, Hester called Owens from a pay phone. When Owens arrived, Hester got into Owens' car and it pulled away. According to Jackson, Richmond told him to follow. Owens stopped a block later. After Hester purchased $20 worth of marijuana, he got out and started walking back toward the Jackson car. Jackson testified that Richmond then handed him a .40 caliber handgun and told him to "go get" Owens. Once Jackson neared Owens' passenger side window, however, Owens drove away. Jackson testified that he got back in his car and tossed the handgun at Richmond, who told him to follow Owens.

After pursuing for a couple of blocks, Jackson cut Owens off by swerving in front of his car. Jackson and Richmond then got out and approached Owens' car. Jackson testified that he tried to reach in and turn the ignition off so he could take Owens' money. As Jackson reached, Richmond shot through the front windshield and struck Owens in the chest. While Owens put the car in reverse to get away, Jackson grabbed the steering wheel. Owens' car then got stuck on a fire hydrant. According to Jackson, Richmond fired several more shots, and Owens was hit twice more. One was a head shot which instantly killed him.

While Jackson identified Richmond as the shooter, both Hester and Brown testified that they ducked when they heard shots and saw nothing more happening outside of the car. Richmond did not testify.

After the shooting, Hester moved into the driver's seat and began to drive once Jackson and Richmond got back in the car. Hester testified that after the shooting, Jackson was carrying a different handgun from what he had been carrying earlier. Jackson also got some of Owens' blood on his arm.

Owens was a well-known drug dealer. Officers found $25 in his left hand, $15 in his pocket, and a small baggy of drugs on his person. They also found a glove containing Richmond's DNA at the scene. Richmond was arrested in Miami, Florida, approximately 10 days later.

In exchange for their testimony in Richmond's jury trial, the three other men received plea deals. Jackson pled guilty to one count of conspiracy to commit aggravated robbery, one count of

attempted aggravated robbery, and one count of aiding a felon. He testified that he expected to serve 8 1/2 years in prison. Hester pled guilty to attempted aggravated robbery and testified that he expected to receive 4 years in prison. All charges against Brown were dropped. The jury convicted Richmond of first-degree premeditated murder, and the court later sentenced him to the hard 50.

More facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court did not err in admitting a statement made by Richmond more than 2 years before the shooting.*

Richmond first argues the trial court erred in admitting evidence of his statement to drug task force agent Beth Brooks. Specifically, Brooks had interviewed Richmond in September 2004 as part of a cocaine investigation. Brooks testified that Richmond told her at that time that he did not sell crack cocaine. The prosecutor then asked, "What did he tell you his specialty was?" Brooks answered, "He said that he robbed and killed people." Richmond now argues that the testimony was inadmissible because of K.S.A. 60-445, 60-447, and 60-455.

The State generally responds that the evidence is not barred by K.S.A. 60-455 and that Richmond is prohibited from arguing the other statutory prohibitions.

The State had filed a motion in limine to admit Brooks' testimony about Richmond's statement as relevant to his state of mind, plan, and intent. Richmond responded that the State was instead trying to inform the jury of his prior crimes: 1995 guilty pleas to second-degree murder and voluntary manslaughter arising out of a Missouri drug robbery. Specifically, he noted that Brooks remembered his statement—"[he] said that he killed and robbed people, he did not sell crack"—as being said in the present tense, but that she admitted that her written report showed his statement was made in the past tense, *i.e.*, "Richmond stated that he *had* committed robbery and murder." The report is not in the record on appeal.

After the trial court determined that Brooks' evidence was susceptible to both interpretations—past or present tense—it found that Richmond's argument went more to the weight of her testimony than its admissibility. He invited defense counsel to explore her inconsistencies at trial:

"It seems to me that your argument, [defense counsel], goes more towards the weight rather than the admissibility. You have a full right to cross-examine Agent Brooks with regard to the factors you've just told me about. This was three years ago. Well, you put it in the past tense in your report. You just now a week before trial, roughly, brought it up. Those are valid points for cross-examination but if, in fact, it is said in the *present* tense, it is not referencing the 1995 murder when the defendant, pursuant to the testimony today, says I don't do crack cocaine, I kill and I rob in so many words."

The court then found that the statement was relevant because it essentially referred, among other things, to Richmond's sense of identity:

"That speaks to his method of acting, his approach to these things, his state of mind, his plan, and that is not referencing—that is a course of conduct, typical course of conduct, that in the *present* tense is not referencing the incident in 1995.

"This is just what he does, this is him, as [the State] pointed out. He doesn't do crack cocaine. He kills, he robs . . . . And I think in that instance it is arguably relevant." (Emphasis added.)

Shortly before Brooks' trial testimony, Richmond again objected. He argued that the testimony was too remote to be relevant to prove his state of mind on the day of the shooting and was being offered as propensity evidence in violation of K.S.A. 60-455.

The trial court rejected Richmond's argument that the evidence was being offered to show propensity:

"[P]ropensity evidence applies to priors the defendant was involved in. The State cannot introduce priors to show a propensity to commit crime. This is not offered for that purpose. This is not a specific prior the State is attempting to introduce to show propensity."

The court again observed that the statement instead referred, among other things, to Richmond's sense of identity:

"These are words spoken by the defendant which arguably shed lit [*sic*] on his state of mind, his method of being, this is what I am, this is what I'm about, this

is what I do. That's the context the Court accepts these comments in. I don't accept them in the past tense because Beth Brooks testified [at the pretrial hearing] these were said in the present tense."

The court reminded the State that "under no circumstances" would Brooks be allowed to mention the 1995 convictions. She later testified:

"[PROSECUTOR]:    [W]hat was the reason for the interview [on September 17, 2004]?
"[BROOKS]:    We were interviewing Mr. Richmond in reference to sale of cocaine.
"[PROSECUTOR]:    What did he tell you about selling cocaine?
"[BROOKS]:    That he did not sell crack.
"[PROSECUTOR]:    *What did he tell you his specialty was?*
"[BROOKS]:    *He said that he robbed and killed people.*
"[PROSECUTOR]:    When he said this, was he serious or kidding?
"[BROOKS]:    He was very serious.
"[PROSECUTOR]:    No further questions." (Emphasis added.)

After Brooks' testimony, Richmond asked that it be stricken because it was stated in the past tense and essentially referred to his 1995 convictions. He also asked for a mistrial. The judge disagreed: "He just said this is his specialty, robs and kills people, I didn't take it in the past tense." The judge found that the State had "gone out of its way to be particularly careful so we didn't reference this past tense and present tense issue," *i.e.*, place before the jury any reference to his 1995 convictions. After both motions were denied, Richmond cross-examined Brooks on the differences between her written report and trial testimony.

*Standard of Review*

Our standard of review for admissibility of evidence is well known:

"When a party challenges the admission or exclusion of evidence on appeal, the first inquiry is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, an appellate court reviews the decision de novo." *State v. Walters*, 284 Kan. 1, Syl. ¶ 2, 159 P.3d 174 (2007).

Richmond argues that the evidence should have been excluded under three different evidentiary statutes. Each basis will be discussed in turn.

### K.S.A. 60-455

K.S.A. 60-455 prohibits evidence of prior crimes from being admitted to prove a defendant's propensity to commit the charged crime, but it can be " 'admissible when relevant to prove some other material fact.' " *State v. Garcia*, 285 Kan. 1, 12, 169 P.3d 1069 (2007). Richmond again argues that Brooks' "robbed and killed" testimony was inadmissible evidence of his prior crimes, *i.e.*, to prove propensity. The State responds that the testimony simply does not fit within the statutory prohibitions. That statute states:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a *specified occasion*, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 40-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Emphasis added.)

We agree with the State. Richmond's statement to Brooks simply does not concern a "crime or civil wrong [committed] on a specified occasion" as the statute requires. Indeed, the trial court reminded the State that Brooks was not to mention Richmond's 1995 convictions and later complimented the State for being particularly careful in its efforts to comply. It admitted Brooks' testimony as generally indicating Richmond's state of mind and sense of identity, *e.g.*, who I am and what I do.

### K.S.A. 60-447

Richmond next argues that Brooks' testimony is evidence of a bad character trait and that its admission violates K.S.A. 60-447 because he did not first offer any evidence of his good character. The statute states in relevant part:

"Subject to K.S.A. 60-448 when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that . . . (b) in a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence

of the offense charged, . . . (ii) if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character."

Richmond acknowledges that he makes this particular argument for the first time on appeal and recognizes that "[a]s a general rule, a party must make a timely and *specific* objection to the admission of evidence in order to preserve the issue for appeal." (Emphasis added.) *State v. Bryant*, 285 Kan. 970, Syl. 6, 179 P.3d 1122 (2008); see K.S.A. 60-404. He nevertheless contends that our rule should be waived because he qualifies in two of the categories recognized in *State v. Stevens*, 278 Kan. 441, 454, 101 P.3d 1190 (2004), for when appellate courts can consider new issues on appeal:

" ' "(1) Cases where the newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case; " ' "(2) Questions raised for the first time on appeal if consideration of the same is necessary to serve the ends of justice or to prevent denial of fundamental rights." ' "

The State essentially responds that a party " 'cannot object to the introduction of evidence on one ground at trial and then assert another ground on appeal.' " *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005); see *State v. Patchett*, 203 Kan. 642, 645, 455 P.2d 580 (1969) ("the specification of an objection to evidence on one ground waives or estops the objector from making an objection on any other ground"). It further asserts that neither of Richmond's proffered *Stevens* exceptions apply. We agree with the State for many reasons, several of which will suffice.

First, as recently as March of this year in *State v. King*, 288 Kan. 333, 204 P.3d 585 (2009), we emphasized "the importance of this legislative mandate" contained in K.S.A. 60-404 which "dictates that evidentiary errors *shall not be reviewed on appeal* unless a party has lodged a timely and *specific* objection to the alleged error at trial." (Emphasis added.) 288 Kan. at 349. There, because defendant failed to object at trial to the prosecutor's cross-examination of him, we refused to consider his argument that the examination violated his rights under *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976) (prosecutor's use of defendant's postarrest silence to impeach credibility violates Fifth and Four-

teenth Amendments to the United States Constitution). We acknowledged, however, that we would continue to review, without trial objection, nonevidentiary-based claims of prosecutorial misconduct, *e.g.*, comments to a jury during voir dire. 288 Kan. at 349.

*King* affirmed this court's prior treatment of failures to object to evidence under K.S.A. 60-404, even where constitutional rights were at stake. See, *e.g.*, *State v. Mays*, 277 Kan. 359, 384-85, 85 P.3d 1208 (2004) (defendant's failure to timely object to alleged hearsay statements precludes defendant from raising issue on appeal, even where alleging violation of Confrontation Clause of Sixth Amendment to United States Constitution). While we acknowledge *King* and *Mays* involved no objection, and here we are instead concerned with an objection on one ground at trial and another ground on appeal, the same rationale applies. Both types of failure undercut the purpose of contemporaneous objections:

 " 'The purpose of the rule requiring a *timely* and *specific* objection is to give " 'the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial.' " [Citation omitted.]' " (Emphasis added.) *King*, 288 Kan. at 342.

In short, the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error.

Second, even were we to overlook the failure to object on this particular ground, we reject Richmond's argument that here " 'the newly asserted theory involves only a question of law arising on proved or admitted facts and which *is finally determinative of the case.*' " (Emphasis added.) *Stevens*, 278 Kan. at 454. This issue—the admissibility of the "robs and kills" testimony—is not finally determinative. At a minimum, the magnitude of any evidentiary error would still have to be determined by reviewing all other evidence under either the state standard, the federal standard, or both. See K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial).

Third, we agree with the State that if we were to overlook the lack of this particular objection and consider the issue because it

is necessary to serve the ends of justice or to prevent the denial of Richmond's right to a fair trial, these and other caselaw exceptions would soon swallow the general statutory rule. We refrain primarily because we acknowledged in *King* that *"the legislature's intent in enacting K.S.A. 60-404 is clear*: a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review." (Emphasis added.) 288 Kan. at 348. In reaching this conclusion, we contrasted that statute with other legislative pronouncements, *e.g.*, K.S.A. 22-3414(3), where the legislature "has created exceptions to the rule requiring objections to preserve an issue for appeal in some non-evidentiary contexts." 288 Kan. at 348.

We finally observe that here defense counsel clearly had several opportunities to argue the applicability of K.S.A. 60-447—at the pretrial hearing, during the afternoon shortly before Brooks testified at trial, and during her later testimony itself. For all of these reasons, we will not consider this argument on appeal.

### K.S.A. 60-445

Richmond also argues for the first time on appeal that Brooks' testimony should have been excluded under K.S.A. 60-445 because its probative value was substantially outweighed by its resulting prejudice. That statute provides:

"Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

We will not consider this argument for the same reasons outlined above concerning K.S.A. 60-447.

### Issue 2: *The trial court did not prevent Richmond from fully presenting his defense.*

Richmond next argues he was denied his fundamental right to present his defense because a trial court evidentiary ruling effectively prevented him from testifying. Specifically, the court had denied the State's motion under K.S.A. 60-455 to introduce evi-

dence in its case-in-chief of Richmond's 1995 Missouri convictions for second-degree murder and voluntary manslaughter. But it held that if Richmond admitted he was present at Owens' shooting, but was unaware of what was going to happen, the State could introduce his convictions on rebuttal.

Richmond contends this ruling was erroneous because his providing an innocent explanation of his presence at the scene with a general denial of wrongdoing does not place intent at issue. Moreover, he argues that he did not testify because he did not want these convictions in evidence.

The State responds that Richmond's decision not to testify waives any challenge to the trial court's ruling. Its cited authorities include *Luce v. United States*, 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460 (1984), and *State v. Smyers*, 207 Ariz. 314, 86 P.3d 370 (2004). We generally agree with the State.

After denying the State's motion brought under K.S.A. 60-455 to admit the conviction evidence in its case-in-chief, the judge stated:

"However, having said that . . . if it should become a situation where the defendant does admit some sort of presence and indicates he was not aware of what was going down, so to speak, he has an absence of knowledge, some sort of mistake, some sort of lack of intent; in other words, he has some sort of innocent explanation for what occurred . . . then I would allow the State to introduce the Kansas City homicide in rebuttal."

Later during trial, he reiterated:

"The defendant won the 60-455 motion but I think it is inherently fundamentally unfair for the defendant to win that motion and then testify he was present at the scene but had no awareness that this was going to occur.

"Because of that, I would allow the State to present that on rebuttal should the defendant allege 'I was there but I had no awareness that this was going to occur.' However, if the defendant simply testifies and alleges 'I was not there, I don't know what you are talking about,' then that does not open . . . up the presentation of the prior [convictions] through rebuttal offered by the State."

*Standard of Review*

We have held that a defendant is entitled to present his or her defense, and a defendant's fundamental right to a fair trial is violated if evidence that is an integral part of that theory is excluded.

*State v. Cooperwood*, 282 Kan. 572, Syl. 1, 147 P.3d 125 (2006). However, that right is not unlimited. "[T]he right to present a defense is subject to statutory rules and case law interpretations of the rules of evidence and procedure." *State v. Walters*, 284 Kan. 1, Syl. 1, 159 P.3d 174 (2007).

We begin our analysis by reviewing *Luce*. There, the defendant was charged in federal district court with conspiracy and possession of cocaine with intent to distribute. At trial, he sought to prevent the government from impeaching him with a prior conviction for possession of a controlled substance. The district court found that the prior conviction was proper impeachment evidence under Federal Rule of Evidence 609(a). It noted, however, that the nature and scope of Luce's later testimony could affect its initial evidentiary rulings. As the *Luce* Court explained:

"[F]or example, the [district] court was prepared to hold that the prior conviction would be excluded if petitioner limited his testimony to explaining his attempt to flee from the arresting officers. However, if petitioner took the stand and denied any prior involvement with drugs, he could then be impeached by the 1974 conviction." 469 U.S. at 40.

Luce did not testify, however, and was convicted on all counts.

The *Luce* Court acknowledged the difficulty in reviewing challenges to in limine rulings when the defendant does not testify. Among other things, the record is incomplete regarding the defendant's testimony, the scope of cross-examination, and the effect the impeachment might have on the verdict. In short, "[a] reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context." 469 U.S. at 38. The Court noted as an example that Rule 609(a) required a weighing of the probative value of the prior conviction against the prejudicial effect to the defendant. This function would be greatly hampered, if not made impossible, by a defendant's failure to testify.

The *Luce* Court next observed that any possible harm caused by an in limine ruling initially permitting impeachment by a prior conviction "is wholly speculative." 469 U.S. at 38. It pointed out that because the district court might change its ruling as the case proceeded, whether the evidence would have been actually admitted was conjectural. It suggested the prior conviction might not be

admitted because the defendant himself could testify narrowly or the prosecutor could independently decide not to introduce it. The Court also suggested that a reviewing court could not assume that the in limine ruling was the motivation for the defendant's failure to testify.

Finally, the Court observed that "[e]ven if these difficulties could be surmounted," *e.g.*, if actual harm had been established, "the reviewing court would still face" the problem of determining whether any error was harmless. 469 U.S. at 42. It noted: "Were in limine rulings under Rule 609(a) reviewable on appeal, almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying." 469 U.S. at 42. Accordingly, the Court held that "requiring that a defendant to testify in order to preserve Rule 609(a) claims will enable the reviewing court to determine the impact any erroneous impeachment may have had *in light of the record as a whole.*" (Emphasis added.) 469 U.S. at 42. The preferred method for defendant to raise his claim was for him " 'to take the stand and appeal a subsequent conviction,' " which would present the claim " 'to a reviewing court in a concrete factual context.' " 469 U.S. at 43.

Based on these reasons, the *Luce* Court concluded that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." 469 U.S. at 43.

In the instant case, it is unclear what exact basis the trial court relied upon to allow future admission of the conviction evidence. It denied use of the evidence under K.S.A. 60-455 for the State's case-in-chief. However, it ruled that if Richmond testified that he was present but "had no awareness that this [robbery and killing] was going to occur," then the State would be allowed "to present that [conviction] on rebuttal" because to do otherwise would be "inherently fundamentally unfair." Accordingly, the trial court's basis could simply have been a delayed (rebuttal) use of 60-455 to prove the State's case by establishing the disputed material facts of Richmond's intent or knowledge. In the alternative, the basis could have been purely impeachment, albeit via 60-455, to show that contrary to Richmond's possible testimony that he had no

awareness that the crimes were going to occur, he indeed would have known. Or it is possible that the trial court's basis could have been a combination of both.

Despite the lack of specificity, the instant case is sufficiently similar for *Luce* to control. Both cases certainly share the same difficulties. As the *Luce* Court held, the reviewing court is handicapped in ruling on subtle evidentiary questions outside a factual context; our record is incomplete because it lacks Richmond's testimony and the scope of his cross-examination. We cannot know to what Richmond would have testified, *i.e.*, whether he would admit that he was present, that he participated in the crime, or that he was aware of any plan to rob or kill Owens. Richmond even admitted the possibility of various testimonial scenarios in one pretrial motion: "There is a distinction if this accused were to say 'there was never any plan to rob the [*sic*] or shoot the victim' versus 'I had no knowledge that they were going to plan to rob or shoot the victim.' "

Furthermore, any possible harm caused by the trial court ruling is wholly speculative. The court may have amended its initial ruling as the case proceeded, *e.g.*, after hearing Richmond's testimony and weighing the probative value of the conviction evidence against its prejudicial effect as required by K.S.A. 60-445. Or, the prosecutor could have decided not to introduce the prior convictions for strategic reasons. We certainly cannot assume that the pretrial ruling was the reason Richmond elected not to testify. Finally, this court would have had difficulty assessing whether the purported error was harmless or reversible because the record is incomplete and that determination must be made in light of the record as a whole.

Issue 3: *The trial court did not err in allowing admission of specific instances of Richmond's drug dealing.*

Richmond next argues the trial court erred in admitting evidence pursuant to K.S.A. 60-455 of his previous involvement in the Pittsburg drug scene, particularly his drug dealing. The State argues that this evidence showed his motive, knowledge of the local drug

culture, and awareness that drug dealers are known to carry cash on their persons.

The trial court allowed three witnesses to testify that Richmond was a drug dealer in Pittsburg. One month before Owens' shooting, Kansas Bureau of Investigation (KBI) Special Agent Chad Commons searched Richmond and found $363 in cash and 67 grams of crack cocaine. Four months before the shooting, KBI informant Paula Monsour twice bought crack cocaine from Richmond for a total of $500. Approximately 2 years before the shooting, Richmond told Fort Scott police detective David Hughes that he had intended to net $5,000 from the sale of cocaine that had recently been seized from his house.

*Standard of Review*

As noted previously, while K.S.A. 60-455 prohibits evidence of prior crimes from being admitted to prove a criminal defendant's propensity to commit the charged crime, it can be " 'admissible when relevant to prove some other material fact.' " *Garcia*, 285 Kan. at 12. Determining whether evidence was properly admitted pursuant to K.S.A. 60-455 requires several steps. *State v. Gunby*, 282 Kan. 39, 144 P.2d 647 (2006).

The court must determine that the fact to be proven is material, *e.g.*, concerning intent, motive, knowledge, or identity. In other words, the court must determine whether the fact " ' "has a legitimate and effective bearing on the decision of the case." ' " *Garcia*, 285 Kan. at 14. Our standard of review for materiality is de novo. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008).

The court must also determine whether the material fact is disputed. *Reid*, 286 Kan. at 505; *Garcia*, 285 Kan. at 12 (" '[T]he element or elements being considered . . . must be substantially in issue in the case.' ")

The court must also determine whether the evidence presented is relevant to prove the disputed material fact, *i.e.*, whether it has "any tendency in reason to prove" that fact. K.S.A. 60-401(b); *Reid*, 286 Kan. at 505. This court reviews relevance—in particular, the probative element—of 60-455 evidence for abuse of discretion. *Reid*, 286 Kan. at 507. The burden of proof is on the party alleging

that the discretion is abused. *Reid,* 286 Kan. at 512 (citing *Garcia,* 285 Kan. at 18-19).

The court must next determine whether the probative value of the evidence outweighs the potential for producing undue prejudice. *Reid,* 286 Kan. at 505. Our standard for reviewing this determination also is abuse of discretion. *Reid,* 286 Kan. at 512 (citing *Garcia,* 285 Kan. at 18).

Finally, if the presented evidence meets all of these requirements—that the fact is material; that the material fact is disputed; that the evidence is relevant to prove the disputed material fact; and that the evidence's probative value outweighs its potential undue prejudice—then the trial court must give a limiting instruction informing the jury of the specific purpose for the evidence's admission. *Garcia,* 285 Kan. at 12. As we stated in *Gunby,* "[t]hese safeguards are designed to eliminate the danger that the evidence will be considered to prove the defendant's mere propensity to commit the charged crime." 282 Kan. at 48.

## Relevance and Materiality

The trial court granted the State's motion to allow the testimony for several purposes, including knowledge and motive

"to shed light upon the defendant's alleged knowledge of the value of drugs, of the defendant's alleged awareness of the amount of money that drug dealers are known to carry, that the defendant has perhaps used this incident this alleged incident, to send messages to snitches. The State argues this goes to the defendant's motive, the defendant's knowledge of the Pittsburg drug scene, and related activity, provides knowledge and motive. . . .

"I think that evidence of this nature which sheds some awareness, some insight, illuminate the factors, the acts, that led up to this alleged incident, I think it's simply valuable to the jury. I think its probative value does outweigh any prejudicial nature that the evidence may present."

When denying Richmond's later motion to reconsider this ruling, the trial court reiterated those reasons:

"And so this was allowed by the Court to show the defendant's awareness, knowledge of how the drug scene works, his involvement in it, to partially shed light on his motives for robbing Mr. Owens. That is Mr. Owens was involved in the drug scene, so was the defendant, and then, ergo, the defendant would be

aware that Mr. Owens has been a drug dealer in the local drug scene, would have allegedly substantial sums of money."

*Motive and Knowledge*

Richmond argues that motive—specifically listed as a material fact under K.S.A. 60-455—was not in dispute because money is almost always the motive for robbery. He also argues that the episodes demonstrating his involvement in the Pittsburg drug scene were not relevant to prove motive or any other material fact, *e.g.*, knowledge that Owens carried large amounts of cash. The State responds that motive was clearly material because Richmond was on trial for first-degree murder and the prosecution's theory was that he intended to rob and kill Owens. It further argues the disputed evidence was relevant to several material facts as noted by the district court.

We independently observe that Richmond does not argue that the other material fact identified by the trial court—knowledge—was not material or not in dispute. This potential argument is therefore waived, which establishes on appeal that knowledge was a disputed material fact. See *Cooke v. Gillespie,* 285 Kan. 748, Syl. ¶ 6, 176 P.3d 144 (2008) (an issue not briefed is deemed waived or abandoned). As a result, if we are persuaded that the presented testimony was relevant, *i.e.*, probative, to prove the disputed material fact of Richmond's knowledge that Owens carried large amounts of money, we need not address any materiality or relevancy issues involving "motive." *Cf. State v. Garcia,* 285 Kan. at 15 (because court determined that the evidence was admissible at least for the disputed, material fact of "identity," addressing the alternative basis of "intent" was moot).

While Richmond argues that his awareness of the local drug scene does not prove he knew that Owens carried large amounts of money, we observe that relevance only requires a logical connection between the asserted facts and the inferences they are intended to establish. See *State v. Reid,* 286 Kan. 494, 186 P.3d 713 (2008); see also K.S.A. 60-401(b) (evidence having *any tendency in reason* to prove any material fact). As stated above, de-

termining the probative value of testimony is left to the trial court's discretion. *Reid*, 286 Kan. 494.

We recognize a logical connection between the testimony about Richmond's deep involvement in the Pittsburg drug culture and the inference he would therefore know that Owens carried large amounts of money on his person. More particularly, Richmond, as a long-time drug dealer found with $363 and 67 grams of crack cocaine on his person 1 month before Owens' shooting, would probably know that another drug dealer in the same town would similarly carry large amounts of money during that same time frame. The trial court did not abuse its discretion in making its probative determination.

### Probative versus Prejudice

Richmond next claims that even if this drug culture testimony were probative, it was erroneously admitted because it was unduly prejudicial. This part of the evidentiary analysis is also reviewed for abuse of trial court discretion. *Garcia*, 285 Kan. at 18. As we stated there, only " '[e]vidence that actually or probably brings about the wrong result under the circumstances of the case is "unduly prejudicial." ' " 285 Kan. at 18.

Richmond contends the State could have established its point through less prejudicial means. He points to Jackson's trial testimony that Hester told Richmond that Owens carried $4,000 to $5,000 on his person, and argues this testimony alone was sufficient to prove Richmond's knowledge. Richmond further claims this testimony was highly prejudicial because it informed the jury that he was a drug dealer. The State essentially responds that evidence of Richmond's past drug involvement was unlikely to have surprised the jury given the number of witnesses who were also involved in the same drug culture and who testified accordingly.

We agree with the State. The trial record is laden with drug culture evidence. The murder victim was a well-known drug dealer. Richmond knew that Owens sold drugs to Richmond's fellow passenger Hester mere minutes before Owens was shot to death by Richmond in Hester's presence. Driver Jackson, who assisted in the crime, had been taking PCP since he was 15. We also agree

that any harm arising from this testimony was tempered by the jury instruction which correctly informed its members that the evidence could only be considered to explain Richmond's motive and his knowledge of the drug culture. See *Garcia*, 285 Kan. at 19 (citing *State v. Lane*, 262 Kan. 373, 391, 940 P.2d 422 [1997]). The trial court did not abuse its discretion in ruling that the probative value of episodes of Richmond's drug dealing outweighed its prejudicial nature pursuant to K.S.A. 60-445.

Issue 4. *The prosecutor did not commit reversible misconduct.*

Richmond next alleges the prosecutor engaged in misconduct numerous times. In the brief filed by the appellate defender's office, Richmond alleges the prosecutor conducted the direct examination of State's witness Malcolm Jackson in a suggestive and leading way and told the jury that Richmond specialized in killing and robbery. In Richmond's pro se supplemental brief he alleges the prosecutor misstated the evidence and commented on the credibility of two witnesses.

*Standard of Review*

Our standard of review for allegations of prosecutorial misconduct is well known:

"Allegations of prosecutorial misconduct require a two-step analysis. First the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal." *State v. White*, 284 Kan. 333, Syl. ¶ 1, 161 P.3d 208 (2007).

The same basic analytical framework applies to a defendant's claim that the prosecutor asked improper questions, except in such scenarios the defendant is required to have made a contemporaneous objection. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). If the questions are impermissible, and contemporaneous objections made, the court must then determine whether the questions were so prejudicial as to require a new trial. *State v. Hernandez*, 284 Kan. 74, 159 P.3d 950 (2007); *State v. Swinney*, 280 Kan.

768, 127 P.3d 261 (2006). We have provided specific guidance on how to make this determination:

"In the second step of the two-step prosecutorial misconduct analysis, the appellate court considers three factors to determine whether a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met." *State v. Bryant*, 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 (2008).

Each claim of misconduct will be reviewed in turn.

A. *Telling the jury that Richmond specialized in killing and robbery.*

Richmond argues the prosecutor stepped outside the wide latitude given him with his references in closing argument to Richmond's "specialties." As discussed in Issue 1, the prosecutor asked Brooks, "What did he tell you his *specialty* was?" She responded, "He said that he robbed and killed people." The prosecutor mentioned this testimony in closing:

"The only thing that they were missing, the only thing that they were missing was a guy who would specialize in two areas. A guy that would specialize in two areas. The defendant. And the two things that he specializes in, it is who he is. It is who he is. Arrogant, the man. *Two things that he specializes in is he kills and he robs*." (Emphasis added.)

The State contends that "specialty" was used during Brooks' direct examination to avoid any inadvertent reference to the 1995 convictions. As mentioned, the trial court had instructed the State that "under no circumstances" would Brooks be allowed to mention the 1995 convictions. We concluded in Issue 1 that the prosecutor did not commit error in introducing this testimony. Accordingly, he was permitted to reference it in closing. See *State v. Baker*, 281 Kan. 997, Syl. ¶ 11, 135 P.3d 1098 (2006) ("As a fun-

damental rule in closing arguments, prosecutors must confine their comments to matters in evidence").

B. *Misstating the evidence.*

In his pro se brief, Richmond alleges that the prosecutor misstated the evidence. Specifically, he contends that the evidence does not support the prosecutor's claim in closing argument that Richmond intended for the shooting to send Owens a message. The prosecutor argued:

"The Judge has allowed the State to bring in proof of other crimes and it goes to motive, knowledge and awareness.

"Now, the motive, let's think about—I just talked about what this man is like. He's arrogant, he's the man in charge. And on the 16th or 19th of September he's out there, gets caught in a doggone drug raid and what did the police do? They found crack cocaine in his crotch and they pulled his pants down. Helicopter is flying overhead, all his drug buddies were around, he's humiliated. And he's the type of man that says I'm not going to allow this to happen. Others are snitching and it is time to send a message. Knowledge goes to the issue of an experienced crack cocaine dealer's awareness of the drug scene and the impact of someone snitching."

In response to Richmond's contention, the State argues the evidence discloses that approximately 1 month before Owens' murder, law enforcement officers raided a house where he was distributing crack cocaine. Richmond was arrested one block from the house directly after the raid with $363 and crack cocaine on his person. The State contends that the prosecutor may reasonably infer from this episode that Richmond shot Owens to send a message: that Richmond dominated the Pittsburg drug dealer scene and that he did not tolerate snitches. In support it cites *Baker*, 281 Kan. 997, Syl. ¶ 11. (a prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences based on the evidence).

We agree with the State. Given the timing of these two events involving these two drug dealers, the prosecutor's suggestion that Richmond intended for the shooting to send a message—either because Owens was an unwanted competitor or a snitch—is a reasonable inference to be made from this evidence. It is within the wide latitude given to prosecutors.

## C. *Commenting on Jackson's credibility.*

Richmond also argues the prosecutor improperly commented on Jackson's credibility when he told the jury to ask itself, "[C]ould this guy make that story up?" Richmond disputes the prosecutor's suggestion that Jackson was unable to give false testimony because of his minimal education and years of drug use. During closing, the prosecutor said:

"The DVD from 25 October 2006, if you want to look it over again, get you a cup of coffee, get you some sodas and watch it again, but you saw a man who was in his late twenties, has a sixth-grade education, been on PCP since fourteen or fifteen. Could this guy make that story up? *You've got to ask yourself* could this guy make that story up?" (Emphasis added.)

This court has consistently held that a prosecutor is prohibited from commenting on a witness' credibility. See, *e.g.*, *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005). The State points out, however, that this court has also held that " '[w]hen a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on the evidence, that certain testimony is not believable.' " *State v. Douglas*, 274 Kan. 96, 107, 49 P.3d 446 (2002) (quoting *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 [2000]). Still, the *Douglas* court recognized that "the ultimate conclusion as to any witness' veracity rests solely with the jury." 274 Kan. at 107.

Although these distinctions can quite often be fine indeed, we conclude that the prosecutor was asking the jury to determine whether Jackson was capable of fabricating his story. This question was not a direct bolstering of Jackson's credibility as prohibited by *Elnicki* but within the wide discretion given prosecutors.

## D. *Saying a defense witness could "go back to jail."*

Richmond also argues the prosecutor improperly remarked to defense witness, Roberto Howard, "You can go back to jail." The prosecutor's statement was made in the context of releasing Howard as a witness as follows:

"[DEFENSE COUNSEL]:   May he be released, Your Honor?
"[THE COURT]:              Any objection if he's released?
"[PROSECUTOR]:           You can go back to jail.

"[THE COURT]:           You are free to leave, thank you."

The State responds that Howard's status as an inmate was already well established. We observe that Howard himself testified that he was currently "in the Crawford County jail."

While we question the necessity of the prosecutor's remark, it is within the wide latitude given prosecutors.

### E. *Direct examination of Malcolm Jackson.*

Finally, Richmond alleges that the prosecutor's repeated suggestive questions to Malcolm Jackson on direct examination denied him his fundamental right to a fair trial. The State disputes Richmond's characterization of the questions, pointing out that he objected only four times during a series of about 220 questions spread over 29 pages of trial transcript. It further argues that none is gross or flagrant or based on the ill will of the prosecutor.

Richmond actually objected six times. The objected-to questions for Jackson, and the court's accompanying rulings, include:

(1) "When Owens got there [at the convenience store] and left, what did Al Richmond tell you to do?"

The trial court observed the prosecutor was assuming facts not in evidence and asked him to rephrase, which he did, without subsequent objection: "What did Albert Richmond say?"

(2) "[PROSECUTOR]: What did Owens say [after the first shot]?
"[JACKSON]: He was hit.
"[PROSECUTOR]: Where did he move his hands toward?
"[JACKSON]: His chest.
"[PROSECUTOR]: Once he grabbed his chest—"

The trial court asked the prosecutor to rephrase, which he did, without subsequent objection: "What did you see the [*sic*] Mr. Owens do with his hands?"

(3) "And what did you grab a hold of [when Owens' car went into reverse after he was shot]?"
The trial court observed the prosecutor was assuming facts not in evidence and asked him to rephrase, which he did, without subsequent objection: "You grabbed the steering wheel?"

(4) "Okay. Was the music up or who turned it up [on the way to Joplin after the shooting]?"

The trial court observed the prosecutor was asking suggestive questions and

asked him to "Please continue to rephrase your questions." The prosecutor did so, without subsequent objection: "What type of music was being played?"

(5) "And what did the defendant tell you about the shooting?"

The trial court sustained the objection, agreeing that the prosecutor is "assuming he [Richmond] did tell him [Jackson] something about the shooting by the tenor of the question."

During the resultant break in Jackson's testimony, defense counsel asked that the testimony be struck in its entirety because of the improper questioning:

"We also want to move to strike this witness's testimony in its entirety. We've repeatedly asked that counsel ask non-leading, non-suggestive questions, questions that don't assume facts in evidence before they are even proved and the judge has repeatedly sustained those objections and he hasn't cleaned up his act, he still continues to ask those type of questions."

The judge denied the motion, saying,

"Well, I think he's doing much better. He's not asking the leading and suggestive nor suggesting things that are not yet in evidence. I've told [the prosecutor] to do better and I think he is. I don't think there is any basis for striking the witness's testimony but *I do want to ask that you* [prosecutor] *not ask leading or suggestive or ask questions that there is no evidence admitted evidence as to the reason you are asking the question.*" (Emphasis added.)

With only slight revision, the prosecutor eventually asked the same question concerning what Richmond told Jackson about the shooting, to which the defense counsel again objected. The judge acknowledged the intervening lengthy discussion among court and counsel on another evidentiary issue and said, "I don't have a problem with that. Please move on."

Later, defense counsel objected to his sixth, and last, question in Jackson's examination:

(6) "What did the defendant say about that [police breaking up the crack house crap game]?"

The trial court sustained the objection, agreeing that the prosecutor is "assuming facts not yet evidence." The prosecutor rephrased, without subsequent objection: "Who did you talk to about that?"

We acknowledge that these six questions were generally leading and suggestive or assuming facts not in evidence.

*Harmless Error*

We have concluded that the prosecutor erred in repeatedly asking objectionable questions. Prosecutorial error, however, does not necessarily amount to reversible error for prosecutorial misconduct. Reversal is not required unless the prosecutor's actions deprived Richmond of a fair trial. See *State v. Drayton*, 285 Kan. 689, 708, 175 P.3d 861 (2008). Consequently, we now examine the magnitude of the error.

The first factor to consider in the harmlessness inquiry is whether the misconduct is gross and flagrant, *e.g.*, did it prejudice the jury against Richmond. See *Drayton*, 285 Kan. at 708 (citing *State v. Elnicki*, 279 Kan. at 65). We acknowledge that asking six objectionable questions of the main prosecution witness—in fact, the only witness identifying Richmond as the shooter—during his direct examination in a first-degree murder trial could suggest gross and flagrant misconduct.

We further acknowledge that the prosecutor's persistent use of such questions, despite rephrasing requests and rephrasing instructions from the trial court could, as Richmond argues, constitute evidence of prosecutorial ill will. *Cf. State v. Douglas*, 274 Kan. 96, 108, 49 P.3d 446 (2002) (ill will can be found when prosecutor ignores prior, sustained objection). In *State v. Gleason*, 277 Kan. 624, 88 P.3d 218 (2004), the prosecutor was accused of reversible misconduct by violating a limine order barring evidence of defendant's prior crime. We denied defendant's request for a new trial. But we held that the prosecutor had violated the order with *his questions on direct examination and observed he had repeated* the objectionable type of questions immediately after the original objection had been sustained, the two answers stricken from the record, and the jury admonished by the court not to consider the objectionable elements of the testimony. 277 Kan. at 639-42.

However, we need not answer these particular questions definitively because of the third step in the prosecutorial misconduct inquiry. Simply put, after reviewing the evidence, we conclude that the harmlessness standards are satisfied from both K.S.A. 60-261 ("inconsistent with substantial justice") and *Chapman* [*v. Califor-*

*nia*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967)] (error harmless beyond a reasonable doubt in that it had little, if any, likelihood of having changed the result of the trial). More particularly, the objectionable questions were rephrased and no objections were raised to their modified versions or the resultant answers. Moreover, Richmond was the only person ever identified as the shooter. This critical part of Jackson's testimony was not delivered in response to any questions to which Richmond had objected.

In short, reversal is not required because the prosecutor's objectionable questions and Jackson's resultant answers did not prejudice the jury against Richmond to the extent it denied him a fair trial.

Issue 5. *Cumulative error did not deny Richmond his fundamental right to a fair trial.*

Richmond next argues that cumulative error requires reversal of his conviction and remand for a new trial. He argues that the State's entire case was simply a prolonged attack on his character. The State responds no error was committed; but if so, any accumulation did not deny Richmond a fair trial.

In the absence of any error, none can accumulate. See *State v. Sharp*, 289 Kan. 72, 210 P.3d 590 (2009). The presence of one error is obviously insufficient to accumulate. See *State v. Davis*, 283 Kan. 569, 583, 158 P.3d 317 (2007). To the extent that more than one error may have occurred, we observe that cumulative trial error requires reversal when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Reid*, 286 Kan. 494, Syl. ¶ 20, 186 P.3d 713 (2008).

The only errors were identified in Issue 4. As discussed there, neither the prosecutor's six objectionable questions (which were rephrased without objection) nor any resulting answers prejudiced the jury against Richmond to the extent it denied him a fair trial. Accordingly, there are no other circumstances to be considered in the totality which could substantially prejudice him. See *Reid*, 286 Kan. 494, Syl. ¶ 20. Moreover, Richmond's defense was greatly damaged by his being the only person ever identified as the shooter

and by his statement to law enforcement that he does not sell crack cocaine, but instead robs and kills.

Issue 6. *Richmond's Sixth and Fourteenth Amendment rights were not violated when the trial court imposed a hard 50 sentence without submitting the aggravating factors to a jury for proof beyond a reasonable doubt.*

For his last claim of error, Richmond challenges the constitutionality of Kansas' hard 50 sentencing scheme under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999). He argues that the statute is unconstitutional because it does not allow a criminal defendant the right to have a jury determine beyond a reasonable doubt all the facts which might increase the maximum penalty for first-degree murder.

This court has de novo review of constitutional questions. *State v. Oliver*, 280 Kan. 681, 707, 124 P.3d 493 (2005).

This court has previously rejected the same challenge in numerous cases. See, *e.g.*, *State v. Kirtdoll*, 281 Kan. 1138, 1151, 136 P.3d 417 (2006); *Oliver*, 280 Kan. at 708; *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 107-08, 82 P.3d 470 (2004); and *State v. Douglas*, 274 Kan. 96, 111-12, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003). Richmond has not provided any additional facts or argument that merit reconsideration of this issue. Accordingly, his argument fails.

Affirmed.

DAVID J. KING, District Judge, assigned.